All right, for the record we are hearing argument in Airline Service Providers Association and Air Transport Association of America versus Los Angeles World Airports and the City of Los Angeles numbers 15-55571 and 55572. Thank you, Your Honor, and may it please the Court, Michael Berger for the Airline Service Providers Association, counsel for the airlines, and I are going to split our time in half. I'm going to try to take eight minutes and talk about the labor issues, including, if I can get to it, the expanded concept that the appellee has of the concept of his rights as a proprietor of Los Angeles International Airport, and my colleague will take ten minutes, hopefully reserving two for me to reply. Labor peace agreement, got a lovely ring to it, sounds like a very nice thing to have, but in this case we're not interested in the goal. What's at issue here is the means by which the City of Los Angeles, through its arm that operates LA International Airport, which we all refer to lovingly as LAWA, is trying to put that labor peace agreement concept into practice. Make no mistake about it, this is a compulsory matter. They talk about it being a labor peace agreement, but what LAWA has done is to enact a regulation that applies to all of the members of my organization, which is those people who provide the ground services for the airline companies, the people that we all come in contact with when we're going to the airport, the ticket takers, the baggage handlers, the folks that push the wheelchairs through the airport. Those are all people who work for independent companies that are members of my organization. The airlines don't do those things, they subcontract them. As I understand it, they are licensed or certified to work at the airport, and do they pay a fee to the airport authority for the right to do business there? It's not in the record, but there is a fee attached to that. I mean, I know they independently contract with some of the airlines, like for handling baggage. Of course, they independently contract with all the ground stuff, but they also have to have a license from the airport to be able to operate at the airport, a matter which is of critical importance to my clients, since that's what they're in business for. And as the LAWA brief indicates, this airport is the sixth busiest airport in the world. Well, if your business is servicing the airlines that work at airports, you don't want to be shut out of the sixth busiest in the world. Counsel, I didn't see this in the record, but let's just take Menzies Aviation for one. I'm familiar with it because they operate in Seattle and handle baggage ramp services. I'm assuming that they do business at other airports besides LAX. So my question is, if they were to enter into one of these labor peace agreements, would that be binding on all of their employees all over the country who operate at airports? As set up here, this is done solely for those operating at LAX and while they are operating at LAX. One of the intriguing issues that we have raised below, which we really didn't get much play from the district judge, is that under the Railway Labor Act, which does apply in this circumstance as well, there's a requirement for doing it system-wide. Well, that was really my question because that is sort of a traditional function of the National Mediation Board and the NLRB in determining what the bargaining unit is going to be and what the geographical scope is. And it's one of the things that we have suggested is wrong with what LAWA is trying to do, is that they are interfering with that federal policy. So you'd rather have them apply the rule to the entire country? We would rather have the federal government make a federal policy that would apply nationwide, instead of having to be dealing with one airport at a time in who knows what configuration. You know, we're stuck here with a regulation from LAWA that says that at any time, any labor organization, whether they have a contract or not, can demand, it's the word of the regulation, a labor peace agreement. And when they do that, we have no alternative but to say, okay, let's sit down and negotiate our labor peace agreement. The only thing that has to be in that is that the labor union has to relinquish the right to strike. What is going to happen when they negotiate with our people? We don't know. Because all we do know is that in order for them to sign off on giving up the right to strike, they're going to have to get something else pretty serious in return. I think we probably all understand that argument, but what is it that makes LA a regulator as opposed to a proprietor? You just said that this only applies to LAX, big airport, but that's narrow. A market participant, one would think, LAX is competing with other airports. Around here, I flew into Burbank, but I'm going to fly out of LAX. If I had to cross a picket line, would I go to LAX? Would I go somewhere else? Why aren't those decisions that a market participant would be making as opposed to a regulator? How do we know that? Because it passed a regulation that says you have to do this. But a market participant, a private entity, could have done the exact same thing, right? The distinction between the two is laid out in cases like the Supreme Court's Boston Harbor case and the Seventh Circuit's decision. But Metro Milwaukee, in that case, the rules that were applied applied beyond the business in question. It applied to the other businesses as well, and you just told us that this only applies at LAX. That's right, but what they explained, what the Seventh Circuit explained in Metro Milwaukee and the Supreme Court explained in Boston Harbor was that if the entity is dealing with a third party like my clients that is providing service for the proprietor of the business, as the proprietor of the business, that is an exception that will get you out from under the preemption provided by the federal labor laws. But it's only when they're acting in the sense of contracting with my client. They don't contract with my clients to have my clients provide a service to the proprietor. What does adding one more layer change, though, about whether they could be a proprietor? Well, it changes the rule that the Supreme Court laid down. That's really what we know. We know that the Supreme Court has been clear in cases like Garmin and Machinists that where there is a federal policy, we keep local hands off it. We don't let the localities get in and muck around with what is supposed to be a clear federal policy of how you handle labor relations. And when we allow the operator to come in here and put on its regulator hat as opposed to its operator hat, if it was doing it as an operator... And the way we know it's a regulator is because there's one layer of contracting in between? Because there's a different layer of contracting. Because if you look at those cases, and we've briefed them all... Metro Milwaukee is different because it applies beyond what the government... Well, Metro Milwaukee said if you just had limited this to cases where the services to be rendered, that would be different. That would get you out from under the preemption. That would be within the Boston Harbor rule. And that's where we are here. What happens if an ASPA member is already unionized and the SEIU comes in and says, we want a labor peace agreement with you? And as I read that section 25, it references negotiating terms and conditions of employment including hours and working conditions and so on, which I suspect could conflict with the provisions of an existing collective bargaining agreement with a different union. I suspect it could. And that's part of the problem of not having allowed this case to go past the motion to dismiss stage. We got no discovery. We got no evidence. We didn't get the oral argument on the motion to dismiss. The trial judge just looked at it and said, leave. But we do know from the face of the statute that if the company refuses to enter into this process to agree to a labor peace agreement, then it will not be certified to do business at the airport. That is correct. That is the hammer. But there's no provision that punishes the union even for breaching a labor peace agreement that says we won't strike. None whatever. This is a purely one-sided regulation that puts a thumb on one side of the scale and upsets what the federal law has always been understood to be, which is to say we want a level playing field. Counsel, you're down to ten minutes. I think I'm impinging on my colleague's time. I think I ought to sit down. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court? Robert Spann, appearing for the Air Transportation Association of America, doing business as Airlines for America. And I beg the Court's indulgence. I'm moving rather slowly. I guess I have a back problem. Are you comfortable standing or would you rather sit? I appreciate the question. I think standing is okay. Thank you. And I would like to address the airline deregulation issues in this case. In this case, the district court found preempted a law or regulation that directly and exclusively targets the airline industry. And that is without precedent in this circuit. There have been many cases and the briefs are full of citations to many cases that deal with the issue of preemption under the Airline Deregulation Act. But all those cases, beginning with Charis and its progeny, deal with laws of general application. In Charis, it was whether tort laws should be applied in the situation, for example, where some baggage falls out of the overhead compartment and hits a passenger or if a flight attendant spills hot coffee on a passenger. Whether state tort law can be applied in the context of the provision of airline services. And other cases involving whether minimum wage laws or living wage ordinances should be applied. But here, in none of those cases was there a law directly targeted at airline services as we have here. And we believe that under the clear precedent from the Supreme Court, under Morales, Roe, Northwest versus Ginsburg, that that is preempted. The District Court not only found that it wasn't preempted, but also didn't even give us an opportunity to make our case. The court found that the airlines had no standing to bring an Airline Deregulation Act claim because the law in question, targets service providers, not airlines. The District Court concluded that in one sentence, without any citation to authority, and that's just plain wrong. If we find that they have standing to make the same argument, why does it matter whether you also have standing? Well, actually, the court found that they do not have standing. If we disagree, though, say we disagree, then does it matter whether you have standing? Well, it would lessen my burden, certainly, as long as someone can challenge it. But I think that it is appropriate for airlines to be able to challenge because the law doesn't say, the ADA preemption clause doesn't say who can be the plaintiff, who can challenge. All it says is that a law that refers or relates or has a connection with price, route, or service is preempted. And the identity of the entity challenging the law doesn't matter. And, in fact, in Roe, the U.S. Supreme Court case, the truckers under a similar deregulation provision were allowed to challenge not only the provisional law that affected their acts, but also the provisional law that affected and said what shippers, not the carriers, but the parties shipping the tobacco products could do. Let's pretend you're past this issue. And so now you're into the merits. Is the analysis the same? If we found that Los Angeles was a proprietor as opposed to a regulator, would those cases apply equally to the Airline Deregulation Act? No. There is, and this was mentioned in a footnote, it has not been argued and it has not been briefed. It was not relied upon by the district court. But there is what's known as a proprietor's exception to the Airline Deregulation Act. But that is very limited and it deals, as it's been construed so far, it has to do with the ability of an airport, for example, to set landing fees. It can charge landing fees. That's within their historic proprietary powers. There's no case law equivalent to the Boston Harbor line of cases that was discussed that would apply a similar market participant exception to the Airline Deregulation Act. And are there cases on the other side that do not apply it? I don't believe so. It's not something that I, in my memory, the only case that has talked about the proprietor's exception is a case that I argued against my colleague, Mr. Lewis, in the district, in the D.C. circuit, that had to do with the ability of an airport to do congestion pricing on, so in other words, whether a landing fee could include a component of congestion hour pricing. So it was limited to the landing fee. What about the American Trucking Association's case in the Supreme Court about the Federal Aviation Administration Authorization Act and the market participant exception there? Well, I think there, as I recall that case, the court did recognize that the city of Los Angeles was acting as a regulator, not a market participant. Well, it recognized that there could be a market participant exception, so I'm just wondering why, if there's a market participant exception to lots of different doctrines and laws, it wouldn't apply to this one. All I can say is that that has never been applied to the Airline Deregulation Act context, as far as I'm aware. Is there any reason why the Airline Deregulation Act should be different than other laws that regulate similar things, and whether there should be exception for preemption for market participants? I think, well, I think the basic principle of the Airline Deregulation Act is that you want to avoid what's been called a patchwork of local regulations, each airport setting or each state or locality setting regulations on the activities of a national and international business like airlines. If you're flying from one airport to another and one airport imposes requirements that another airport does not, that's going to create real problems. So the uniformity of regulation is very important, and that's something that's been cited throughout. The second, I think, part of it is that, as this court and the Supreme Court have recognized, the Airline Deregulation Act was aimed at deregulating the economic aspects and enhancing competition in the industry, and to the extent that individual localities or airports can undermine that goal by presenting their own ideas of how services should be provided or what should be done at a given locality, that will defeat that purpose of the act. Do you want to save the balance of time for rebuttal? I will. All right. Thank you, Your Honor. Thank you. Good morning. Richard McCracken for the defendants. The city of Los Angeles and Palawa. Seated with me at the council table is Scott Lewis. Section 25 is not unprecedented. It is very much like the law that was passed by the city of Pittsburgh and upheld in the Sage Hospitality case and the decision written by Judge Chertoff. But Pittsburgh, it vaulted, if not government funds, that were being expended to promote redevelopment in the city? Yes, Your Honor. It was actually a much more limited proprietary interest than the one here. This case, the proprietary interest, is like that in Boston Harbor, which is a government entity that owns a very big business enterprise. The Los Angeles International Airport is one of the biggest business enterprises in the country. Let me cut to the chase here. Does this case then turn on whether or not the market participant exception applies? Would you concede that if we find that LAWA is not entitled to claim the market participant exemption, then this regulation would be preempted by federal labor and airline regulation laws? We don't think so, Your Honor, because the plaintiffs have failed to show that any right or immunity that they have under either the National Labor Relations Act or the Railway Labor Act has been in any way infringed. Well, what do we do with the mandatory arbitration provisions in Section 25? Your Honor, one of the things that's very interesting about Section 25, and both arbitration and also about negotiation, is that the arbitrator but also the service providers themselves do not have to address, and the arbitrator may not address anything having to do with terms and conditions of employment. What's the meaning, what is it, 25.2? I find that section to be very confusing. Yes, Your Honor, let me explain it if I may. 25.7 is important because 25.7 abjures any involvement by the government in any of the things that are regulated by those two labor laws. I find that 25.7 to be somewhat sophistic in the sense that if there is an obligation in the earlier subsections of 25 that requires the employers to engage in mandatory collective bargaining, which I think is what this is even though it's called a labor peace agreement, and that if the employer and the union can't agree, then the matter is going to be resolved first through mediation and then binding arbitration, and that it may include terms and conditions of employment. Why doesn't that directly conflict with the provisions of federal labor law and recognition by the Federal Mediation Board and Section 7 and 8 of the NLRA? It is because, Your Honor, Section 25.7 specifically forbids an arbitrator from imposing anything having to do with terms and conditions of employment and further absolves any service provider from any obligation to deal with a union on those subjects. It specifically excludes from the scope of this section any terms and conditions of employment, any recognition of a union as a representative, any method for recognizing a union as a representative, or any collective bargaining agreement. So what would the arbitration award look like? Your Honor, if there were an arbitration, and remember that this is only something that would happen if the union agreed because arbitration is a two-way street. So even though this requires a service provider to agree to arbitration, that doesn't mean an arbitration will occur because the union would have to agree to it as well. Because arbitration is a consensual, contractual matter. If no labor peace agreement is reached, then doesn't the service company lose its certification to work at the airport to provide services? It may be in breach, but this is a contract. This document is a contract. It is not an ordinance. What is the purpose of the language in 25 that talks about terms and conditions? Well, the part that talks about terms and conditions takes it out of the picture. The part that must be in, and the only part that must be in an agreement, is a promise by the labor organization not to strike, picket, boycott, and it's not just strikes. It's also these other things like boycotts. Unions are privileged to use secondary boycotts, bring in other people into their disputes, as has happened at LAX. And this is what the airport's concern is, is to make sure that labor disputes don't occur that interrupt the operations and involve the much larger airport community in labor disputes. So that's its only concern. I understand all that. I think it's a legitimate concern. But it sort of begs the question as to whether or not this regulation, provision, whatever you want to call it, I don't mean to use that term in a pejorative fashion, somehow requires the parties to do something that the labor laws do not otherwise permit. And I read that provision as essentially requiring the employer to recognize, first of all, the SEIU as the representative to bargain the labor peace agreement, even though the SEIU has not gone through a contested election that's overseen and then certified by the mediation board. So what do you do in a situation where the employees, let's say the baggage handlers, are already represented by a different union? Not only does Section 25.7 specifically forbid a union from insisting upon being recognized and privileges the service provider to ignore that kind of request, but it would also be illegal under federal law. But nothing in this provision prevents the SEIU from approaching the employee and saying we invoke Section 25 and we want you to negotiate a labor peace agreement with us. And if the world, just a labor peace agreement, that would be fine because there would not be any conflicting obligations because the labor peace agreement is only about whether the union will exercise these weapons of economic warfare. That's the only subject. Okay, so let's play out what would happen in the timeline. So the request is made to invoke this section, and you're saying the union could refuse to go to arbitration. But if the union invokes the section but won't go to arbitration, aren't you in the exact situation that they're saying, is that the union can demand concessions at that point that would relate to conditions of employment? If the union demanded those concessions and the service provider said no, we won't because we're not obligated to do so, and let's say that the union went to the airport and said they're not entering into a labor peace agreement, and the service provider said it's because they're asking for things they're not allowed to ask for, then the airport, as the contracting party, would be hard put to find the service provider in breach of this section. How do we know that, though? It seems like if they don't have the labor peace agreement at that point, they don't get their license. They have a labor peace agreement, but the section is carefully crafted, as the district court noted, prevents a union from demanding to be recognized when that's not proper, or even if it were proper, because that's outside of the scope of this. So is it your position that basically there's no negotiation? I mean, it almost sounds then like what you're saying is all this does is say unions can have labor peace agreements if they want them or not. I don't even understand why they have to be involved at that point. The airlines, of course, are not involved at all. Okay, but so the service providers. Service providers, if a union comes and says, we want to negotiate a labor peace agreement with you, then they must try to do that. So what are the negotiating tools? The NLRA says that you must bargain in good faith, but it doesn't say that you have to actually reach agreement. This says you've got to reach agreement, and if you can't do it in face-to-face negotiations, we're going to do mediation, and then we're going to go to binding arbitration. Not even federal labor law goes that far. Well, the airport, of course, is not involved. The airport doesn't go to arbitration. The parties go to arbitration if they agree to go to arbitration, and this requires, this contract requires the service provider to agree to go to arbitration if the other party wants. So you agree that it requires more than the National Labor Relations Act would require if this were a recognized bargaining agent, and they were negotiating over the terms of a collective bargaining agreement. If they were negotiating over the terms of a collective bargaining agreement, the question of arbitration would be a non-mandatory subject to bargaining. The union couldn't even insist that that happened, so that's absolutely. Under the regulation, this is mandatory. It must result in a labor peace agreement because in order to be licensed, the company shall have in place at all required times a labor peace agreement with any labor organization that requests it. The question is also provided that no one, no service provider is required to stop providing services while this process takes place. What do you think the things that would be negotiated would be? I mean, what are the bargaining chips here? It seems like you're reading this differently than I had read it, so I'm curious what you think this negotiation would look like. I think it would probably, from experience, entail, first of all, an agreement to not have either party use weapons of economic warfare because the employers have them, too. The employers have the power of lockout as well as other means of exercising pressure in labor disputes, so there would be a mutual stand down in using those tools. Although if there can't be a strike, there's no reason for a lockout, right? An employer can lockout if it chooses to. It doesn't have to lockout only in response to a strike. The Supreme Court held in the American Shipbuilding case in the mid-60s that employers can use offensive lockouts, and they do. Okay, so any other bargaining chips? Yes, the union might ask the employer to not mount an anti-union campaign. That's one of the frequent subjects of union organizing campaigns is a vituperative campaign on part of all the participants. So the parties could both agree to conduct themselves simply. But that was permitted by federal labor law that the employer on work time is entitled to call its employees in so that they can talk about efforts to unionize. That's absolutely right, Your Honor, and the reason why this section does not address that subject, because that is a right that is under federal labor law. That's one of the things that's key about this is that all those rights employers have under federal labor law are not addressed here. But you're saying that they might have to be given up because of the negotiation that would happen under this section. They might have to be negotiated. And the question is, what happens if the parties fail to reach agreement? One of the things that may happen is that they can continue to use these weapons. The airport doesn't want them to because that's the whole purpose of this is to stop them from doing so. But if a union is unable to get the agreement it wants, it may strike, picket, boycott, secondary boycott in order to force the employer into such an agreement. The purpose of this policy is to avoid all that if possible. But the irony here is that it's not the union that is the recognized bargaining agent of the employees. That's what I find so bizarre about this scheme. Some of them are. Oh, yes, because they don't have to be. This applies to both ones that are already unionized and ones that are not. And as the complaint shows, there are ones that are already union. But in that case, isn't the National Mediation Board the final arbiter of which labor organization is entitled to represent the company's employees? Under the Railway Labor Act? Yes. If they if the parties don't agree. But under the Railway Labor Act, as under the National Labor. Suppose I'm the Teamsters Union and the SEI and I represent the employees of the refuelers. And the SEIU comes to the employer and says, we want to negotiate some terms here under the labor peace agreement. Why would another union want to allow a competing union to enter into binding negotiations with its employer over things that will affect the terms and conditions of work? That's that's what's in the collective bargaining agreement. Yes. And that's not what's in a labor peace agreement. As 25.7 makes clear, the union that is not the incumbent who wishes to to organize to raid the other one, let's say, can only get an agreement about the use of economic weapons. It cannot get a collective bargaining agreement even through arbitration. That's forbidden in Section 25.7. So this is designed to prevent an employer from being in the position of having contrasting obligations to two different unions. So will the result then be that some service providers at LAX will have labor peace agreements, but others will not? Yes. Then how does that further the interests of the L.A.W.A. in maintaining labor harmony at the airport? The airport wishes that they all would have them, but it cannot force any union. It doesn't have any regulatory or proprietary authority or relationship to any of the unions. It doesn't do business with them, unlike the service providers. So it cannot make unions go seek representation of or labor peace agreements with any of the service providers. All it can do is to tell a service provider that if it happens that a union comes to you and you don't have to go find one. But if one comes to you, then you need to try to get a labor peace agreement. So can you speak to why we should consider you a market participant? Yes, because this is like Boston Harbor. It's a huge business enterprise. It's a proprietary department of the city of Los Angeles, as alleged in the complaint. The complaint alleges that this is a proprietor. What about the argument that there is an extra layer at LAX that takes it out of the direct relationship between the proprietor and its employee? Well, among other things, there is a direct relationship between the airport and the service providers there under contract together. And the contract looks like most other commercial contracts that has many provisions besides the labor provisions. And also it is in the record that the service providers pay a fee. It's a sliding scale fee based on revenues to the airport. That's in Exhibit C to the provider agreement, which we provided as an attachment to our brief. And there's reference in the agreement itself, which is in Exhibit B to the complaint, to the payment of fees. That's in Section 2.1 of the agreement, which is in Excerpts. Excerpt page 76, Section 4.1 provides for the payment of fees to the city pursuant to that Exhibit C that I referred to. Also, unlike any kind of regulatory scheme, this contract provides for an employer to be audited, to have all of its books and records audited by the airport to make sure that the fee is being paid in full. That is not something one finds in a regulatory environment. And there are many other provisions throughout this fairly long agreement that really are just what you would find in any kind of landlord-tenant lease or in any kind of commercial contract about the respective rights and obligations of the parties. With respect to the Airline Deregulation Act, are there requirements in Section 25 that will be different for the airlines than they'll have to deal with in other localities? And is that a reason to analyze that statute differently than the others? As Mr. Berger noted, this policy applies only to LAX. It has no effect anyplace else outside of LAX itself. So it doesn't have any extraterritorial effect. How would we handle the situation where, my Menzies Aviation example, where there is a, or there might be a collective bargaining agreement that's system-wide and therefore an agreement entered into here might have an impact on Burbank operations? Because the agreement here could only be what the union would do at LAX with respect to those employees. So it would not have any spillover effect anyplace else. Again, one of the things that this does is very consciously avoids the kind of problem that existed in the Metropolitan Milwaukee case where there was that kind of spillover. It also avoids the other serious problem in the Metropolitan Milwaukee case, which is that the labor peace promise only lasted through the point of union recognition and not thereafter, which led the court to, I think quite rightly, conclude that this doesn't really have much to do with labor peace. It actually creates the opposite effect, creates greater risk of labor disputes after recognition. This one applies throughout the entire relationship. What about the fact that the provision is essentially one way in the sense that if the employer doesn't enter into the agreement, it doesn't get a license to operate? If the union violates the provision of the labor peace agreement, there is no penalty. There's no governmental remedy because there's no relationship between the government here, LALA, and the union. So there's nothing that LALA could do to them. However, if a union enters into a labor peace agreement, that is then an enforceable agreement. Section 301 added to the National Labor Relations Act and the Taft-Hartley Amendment specifically to make unions answerable when they violated their agreements gives the federal courts jurisdiction and the state courts as well. There's concurrent jurisdiction over claims of violation of collective bargaining agreements. But your position is not a collective bargaining agreement. The problem I'm having is that you're citing cases that talk about different types of agreement. And, Your Honor, I'm sorry. I shouldn't have said collective bargaining agreement because Section 301 does not say that. It says agreements between unions and employers in commerce and the Supreme Court held in the Lyon dry goods case that a non-collective bargaining agreement, a labor peace agreement between a union and department stores in Cleveland was still enforceable under Section 301. So Section 301 applies to any kind of agreement under sections between a union and an employer in commerce that affects labor peace. And, in fact, that's what the court said in Lyon dry goods was the reason why that labor peace agreement was enforceable because of that element. Okay. Thank you very much, Mr. McGregor. Your time has expired. Well, thank you very much for the consideration. Thank you. McGregor, you've got about two and a half minutes. Thank you, Your Honors. Would you start with what will you learn from discovery that would help you expand the record to give the court more information about this? Or do we not have enough given the fact that we've got the agreement, we have the basic understanding of what this case is about? I think one of the things we could learn from discovery is what the heck is going on here? I mean, I gather from the questioning from the bench that the court is at least as confused as we are in some ways about why is L.A. doing this? What's behind it? Now, the initials SCIU have come from both sides of the bench here, and we've alleged it in the complaint. Why will that make a difference? Because it gets into this question of why are they doing this? But why does that matter? What's the legal relevance of the motive? Because it's a pretext to get favors for friends of the folks who are running the airport. Okay. That's one bit of discovery. What other discovery would you be able to get that would illuminate the issues that we have to decide? I suppose we could do discovery as to what kinds of bargaining we're going to be up against. That's something that we don't really, all we can do is conjure based on what other people in the past have done. They've asked for things like counsel mentioned, you know, banning lockouts. But, of course, that would operate as to people that the union asking for the labor peace agreement doesn't represent at the moment. They're represented by other people or by nobody. Other times unions have asked for contact information about the employees and how do we get a hold of these people off the job site. Access to them on the job site. I'm sorry. To aid in organizing efforts. Yes, Your Honor. And because we believe that part of this is to allow some stronger, more influential unions to bump aside unions that are already representing some of the employees of our members. Is there any discovery that could be taken on whether the airport is a market participant? It's a fact question. In what sense is it a fact question? What are they doing? What are the requirements under the case law that we've set up? We know what the Boston Harbor case says. Boston Harbor and the cases that came after it have said that unless you are directly contracting, it works. Boston Harbor actually talks about contracts or subcontracts. So, I'm not really sure. The agreement in that case talked about contracts or subcontracts. So, I'm not really sure why you think it did require direct contracts. Because that's the way the cases that come after it have all interpreted it. Is there anything in our circuit interpreting Boston Harbor to require it to be a direct contract? There are some Ninth Circuit cases that we cited for you. Hang on for a moment and I'll try to find that. I know we cited the Associated General Contractors versus Metropolitan Water District, which involved contractors who were hired by the agency to construct a project. Is there any case that you know of that says you have to directly contract to be a market participant, that you can't worry about subcontractors? I think those cases that are cited in there are in our opening brief on page 24. That's the best I can do for you at this point. I think that those cases do say it. Otherwise, I see my light is coming. I was tempted to simply say I'll submit on the questioning of the panel. Be careful.  It doesn't necessarily indicate what you want to do. I decided to try to say something anyway. All right. Thank you, Your Honor. Thank you. Counsel, the case was very well argued. We appreciate the arguments and we'll puzzle our way through it and give you an answer as soon as we can. We are adjourned for the week. Thank you all. Thank you very much.
judges: Tallman, Friedland, Orrick